Robert Lee WILSON, Plaintiff-Appellant,

v.

Irvin T. TAYLOR, as acting Chairman and Examiner, Civil Service Board, et al., Defendants-Appellees.

No. 79–2892.

United States Court of Appeals,
Fifth Circuit.*
Unit B

Oct. 13, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Stephen A. Weinstein, Robert F. Evans, Jr., Orlando, Fla., for plaintiff-appellant.

Frederic O'Neal, Orlando, Fla., for defendants-appellees.

Before VANCE, HATCHETT and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant, Robert Lee Wilson, is a former officer with the police department of Winter Park, Florida. He filed this suit pursuant to § 1 of the Civil Rights Act of 1871, 42 U.S.C.A. § 1983 (West 1974), against various officials of Winter Park (hereinafter referred to collectively as "officials") in their individual and official capacities, alleging he was discharged from the police department without procedural due process, in contravention of his First Amendment right of association, and pursuant to regulations impermissibly vague and facially overbroad. The district court, in an order granting Wilson partial summary judgment, found his procedural due process

rights had been violated and ordered the officials to hold a remedial hearing. After the court-ordered hearing, the City of Winter Park reaffirmed the discharge of Wilson. Subsequently, the district court granted the officials' motion for summary judgment, holding that Wilson was discharged because of his association with a known felon, rejecting .Wilson's claim that his First Amendment right of association had been infringed, and rejecting his claim that the regulation under which he was discharged was impermissibly vague and facially overbroad. The district court held that Wilson had been deprived of procedural due process, but that the remedial hearing had cured that violation. Rejecting Wilson's claims for compensatory and punitive damages for the procedural due process violation, the court awarded only nominal damages of $1.

We vacate the judgment of the district court. We conclude that there is a genuine issue of fact as to why Wilson was discharged. Depending on the resolution of that issue on remand, it may also be necessary for the court below to address Wilson's substantive constitutional claims. In any event, Wilson is entitled to an opportunity to present evidence on his claims that he has incurred actual compensatory damages as a result of the admitted violation of procedural due process. He is also entitled to present evidence on his claim for punitive damages resulting from the procedural due process violation.[1]

## FACTS AND POSTURE OF THE CASE

Although most of the facts are undisputed, there is some disagreement as to the content of conversations Wilson had with various officers of the Winter Park Police Department relevant to the issue of why Wilson was discharged. Since this case was decided on summary judgment, we resolve all factual discrepancies in favor of Wilson.

Wilson was hired by the Winter Park Police Department on June 3, 1971, as a probationary police officer and was assigned to the Uniformed Patrol Division. A year later, pursuant to the City's Civil Service Regulations, Wilson's probationary status ceased and he became a permanent employee.

Late in 1971, Wilson became acquainted with Susan Blackburn, the adopted daughter of Harlan Blackburn, a convicted felon who was reputed to be a key figure in organized crime in Central Florida. At that time, Wilson knew of Harlan Blackburn's reputation as a member of organized crime. In early 1974, Wilson asked Officer Jerry King, a member of the Vice Squad, whether Susan Blackburn had a clean record. When advised that she did, Wilson began dating Susan. Detective Hugh H. Dearing, Commander of the Investigation Unit, shortly thereafter learned that Wilson was dating Susan. He informed Police Chief Raymond E. Beary who indicated that Wilson's association with Susan was proper so long as he did not associate with Harlan. There is no indication in the record that this restriction on Wilson's seeing Harlan Blackburn was communicated to Wilson. For approximately the next year and a half, there was no objection to Wilson's seeing Susan Blackburn, even though they continued dating.

In May, 1975, Wilson's association with Susan brought him into contact with Harlan Blackburn for the first time. About May 9, 1975, at the request of Susan, and while Wilson was not on duty, Wilson accompanied her on an automobile drive to Avon Park Correctional Institution where they picked up Harlan, who had been temporarily released from confinement on an appeal bond.[2] They took a friend's car and Susan was the driver. That night, at the

---

1. .Although we are conscious of the general rule that briefs are to be read liberally in determining the issues on appeal, *Kincade v. General Tire & Rubber Co.*, 635 F.2d 501 (5th Cir. 1981), we do not perceive either in Wilson's brief or in oral argument to this court an argument that the regulations under which he was discharged

are facially overbroad. Accordingly, that issue is deemed abandoned. *Harris v. Plastics Manufacturing Co.*, 617 F.2d 438 (5th Cir. 1980).

2. Harlan Blackburn had been convicted of conspiring to murder.

invitation of Susan and her mother, Wilson dined at the family home [3] with the Blackburn family, including Harlan. The next evening Wilson again dined at the family home with the Blackburn family, again including Harlan and a friend of the family, Father Farley. The contacts during these two days were the only contacts Wilson had with Harlan before his dismissal. There is no dispute that before his association with Harlan Blackburn, Wilson had no blemish on his record and was a good officer.

Later that month, Wilson told Detective Dearing he had picked up Harlan Blackburn at the Avon Park Correctional Institution and had eaten dinner with him twice. About May 16, 1975, at Dearing's request, Wilson had a meeting with Dearing who stated that Chief Beary had asked Wilson to terminate his association with Susan. (Record on Appeal, p. 309). Although Dearing indicated his meeting with Wilson was in strict confidence, immediately after the meeting Wilson was approached by fellow officers who questioned his ability to continue as chairman of the Collective Bargaining Committee of the Local Fraternal Order of Police in light of the department's concern over his activities.[4] Concerned about the spreading rumors among his fellow officers, Wilson promptly sought out Chief Beary to discuss the matter. A meeting among Wilson, the Chief, Deputy Chief Paul Aurbeck, and Detective Dearing ensued that same day, May 16.

Wilson's sworn testimony concerning this meeting is that most of the discussion was about his association with Susan. His impression was that Chief Beary understood the only reason he had any contact with Harlan was because of his dating Susan.

Wilson testified that he had already determined on his own not to see Harlan again. (Record on Appeal, pp. 638–639). At this meeting, Wilson promised not to see Susan again, but denies being asked to promise not to see Harlan again. (Record on Appeal, p. 145 and pp. 638–9, and Supp. Record on Appeal, pp. 63–64). Wilson states that it was understood among the participants that he would not associate with Harlan again.[5] At Wilson's own suggestion, a ten-day suspension with pay was imposed to run, to be followed by a previously scheduled three-week vacation with pay, in order to give the police department time to clear Wilson or to take disciplinary action.

Shortly thereafter, Wilson called Deputy Chief Aurbeck and reneged on his promise not to see Susan Blackburn again. (Record on Appeal, pp. 143–145; 738–740). Deputy Chief Aurbeck states under oath that Wilson indicated he could not keep his promise not to see "the Blackburn family" again.[6] (Record on Appeal, p. 129). In the summary judgment posture of this case, we cannot credit this testimony in light of Wilson's conflicting testimony. Accordingly, we assume for summary judgment purposes that Wilson in no way indicated he could not refrain from seeing Harlan.

During the suspension period, at the request of Chief Beary, Wilson and Dearing met for further discussion of Wilson's relationship with the Blackburns. The meeting was recorded and its purpose, though apparently not communicated to Wilson, was for Dearing to formulate a recommendation on whether or not Wilson should be disciplined. The transcript reveals that Dearing began the interview eliciting a history of Wilson's association with Susan. Dearing

---

3. Susan Blackburn did not live at the family home at any time while Wilson was dating her.

4. Wilson immediately offered to resign his chairmanship of the Collective Bargaining Committee.

5. Detective Dearing and Chief Beary state under oath that Wilson promised to see neither Susan nor Harlan Blackburn. (Record on appeal, pp. 135 and 138). Whether we credit the officer's statement that an express promise

was made not to see Harlan, or Wilson's statement that it was understood there would be no future contact with Harlan, it is clear the parties reached some understanding that Wilson would not see Harlan in the future.

6. In sworn testimony before the City's Civil Service Board, Aurbeck stated Wilson said in reneging on his promise, "It's not fair to me and it's not fair to Susie." (Record on Appeal, p. 485).

then asked Wilson questions to determine the subject matter and extent of Wilson's conversation with Harlan while riding with him from the prison and while dining with him.[7] The interview ended with Dearing indicating for the first time that Susan was under investigation for an unspecified reason by both a state and municipal agency. Wilson reiterated his intention to continue to see Susan and Dearing elicited an acknowledgement that Wilson had already seen Susan after reneging on his promise to Deputy Chief Aurbeck. At no time during this interview did Wilson indicate he could not refrain from seeing Harlan Blackburn again.

Dearing conveyed the substance of this meeting to Deputy Chief Aurbeck, who recommended to Chief Beary that some disciplinary action be taken against Wilson. On June 13, 1975, Deputy Chief Aurbeck requested Wilson's resignation. Wilson refused to resign. Aurbeck then brought Wilson before Chief Beary, who informed Wilson that he was fired, effective immediately.[8] At that time, Chief Beary gave Wilson a memorandum setting forth the department's charges of misconduct and formally notifying him of his immediate dismissal.[9] There is no dispute that Wilson was given no prior notice and no opportunity to offer reasons why his discharge was improper.

Wilson timely invoked his right to appeal his dismissal to the City's Civil Service Board. The Board granted him an informal hearing on August 5, and at its conclusion voted to rescind the termination notice effective upon the completion of a six-month disciplinary suspension. Dissatisfied with the Board's decision, Chief Beary instituted, without formal notice to Wilson, an appeal to the Winter Park City Commission. After a public hearing, also held without formal notice to Wilson, the Commission members present voted to overrule the Civil

7. Wilson's conversations with Harlan were harmless social exchanges. Wilson conveyed no information detrimental to the department.

8. In a sworn statement, Chief Beary stated that the reason he fired Wilson was concern that Wilson's association with Harlan jeopardized the internal security of the department and threatened its membership in the Florida Intelligence Unit, an organization of police departments which acquires and disseminates information to members regarding organized crime. (Record on Appeal, p. 138). Chief Beary was also concerned that Wilson's association with Harlan would jeopardize morale and public confidence in the department. (Record on Appeal, p. 139). Chief Beary states he fired Wilson after he had refused to terminate his relation with Harlan. (*Id.*) Nowhere in this affidavit does Chief Beary indicate that continued association with only Susan would have these deleterious effects.

9. The Chief's memorandum reads:
You have been found to have committed violations of the Civil Service Rules and Regulations under General Offenses and Sections of the Standard Operating Procedure Manual as follows:
You did violate the Civil Service Rules under General Offenses, # 35, "Association with undesirable, immoral, or questionalbe [sic] characters, except in the line of duty," to-wit: did pick up a known and convicted felon from the Florida State Prison System, said person being Harlan Blackburn.

You did violate the Standard Operating Procedure Manual, Section 3.35.13.35., "Association with undesirable, immoral, or questionable characters, except in the line of duty," to-wit: has been dating Susan Blackburn, adopted daughter of Harland [sic] Blackburn, convicted felon, and did in fact, accompany Susan Blackburn to pick up Harland [sic] Blackburn upon his release from the Florida Prison System. Further, did violate the order by being socially entertained on two successive evenings by the Harlan Blackburn family.
You did violate the Standard Operating Procedure Manual, Section 3.35.13.7., Conduct unbecoming a Police Officer, which shall include any act or conduct not specifically mentioned in these rules and regulations, which tends to bring the department into disrepute, or reflects discredit upon the individual member as a Police Officer.
You did violate the Standard Operating Procedure Manual, Section 3.35.13.39., any other act or commission contrary to good order and discipline, or constituting a violation of any of the Rules and Regulations of the Department or of any Department orders.
In accordance with Civil Service Rules and Regulations you are hereby terminated from employment with this Department effective this date.
If you desire to appeal this decision you must present your appeal to the Chairman of the Civil Service Board within ten (10) days of this date.

Service Board and reinstate the Chief's dismissal of Wilson.

Wilson thereupon filed this suit. The district court, in a partial summary judgment order dated September 1, 1978, found that Wilson had a property interest in his employment affording him rights to procedural due process.[10] The district court then found that the pretermination procedure resulting in Wilson's dismisal, as well as the appeal by Chief Beary to the City Commission, did not comport with procedural due process.[11] As partial remedy, the district court ordered that another hearing be held before the City Commissioners or, in the alternative, that Wilson be reinstated.

In timely fashion, the police department notified Wilson of the remedial hearing before the City Commission and sent him a copy of the June 13 memorandum as the reasons the police department would be seeking Wilson's dismissal. At a bifurcated hearing before the City Commission on October 26, 1978, and on November 21, 1978, Wilson and his attorney were allowed to address the Commission. At the November 21 meeting, the Commission adopted the findings of the Civil Service Board that Wilson had violated Section 35 of the Civil Service Rules and Sections 3.35.13.35 and 3.35.13.7 of the Standard Operating Procedure Manual. The Commission overruled the Board's action in supplanting termination with suspension, and reinstated the dismissal of Wilson.

After the remedial hearing before the City Commissioners, the parties renewed their motions for summary judgment. After a hearing on the renewed motions, the district court found that any procedural defects in Wilson's dismissal had been cured by the October 26 and November 21 meetings of the City Commission. The district court then turned to Wilson's substantive constitutional claims. The district court

found that no material fact remained in dispute. The district court relied upon the memorandum given to Wilson when he was terminated, plus Wilson's sworn statements, to find that the "basic cause" Wilson was dismissed was his close, personal contact with Harlan. (Record on Appeal, p. 1172). It rejected Wilson's allegation that he was dismissed because of his association with Susan, noting that it was only after Wilson had come into contact with Harlan that the police department objected to his seeing Susan. The district court concluded that the police department, by requiring Wilson to terminate his relationship with Susan, was taking reasonable precautions to insure that Wilson would not reestablish his contact with Harlan, finding there to be no basis to assume that Wilson's seeing Susan would not again result in a contact with Harlan. It concluded that the police department had a compelling interest in preventing personal contact between a police officer and a convicted felon which might and, in the district court's view, did result in a loss of morale and integrity to the police force. On the basis of these findings, the district court held that Wilson's associational rights under the First Amendment had not been violated. With respect to Wilson's Fourteenth Amendment vagueness claims, the district court concluded that the regulations were not impermissibly vague and that because the regulations clearly applied to association with convicted felons, Wilson lacked standing to argue vagueness as applied to other contexts. Finally, the district court found only a procedural due process violation which had been subsequently cured and concluded that Wilson was entitled only to nominal damages.

## PROPRIETY OF SUMMARY JUDGMENT: FIRST AMENDMENT RIGHT OF ASSOCIATION CLAIM

Although the primary issue for us to decide is whether a genuine issue of material

---

10. The officials do not contest the district court's finding that Wilson had a property interest in his job such as to require procedural due process in termination. *See Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Glenn v. Newman*, 614 F.2d 467 (5th Cir. 1980).

11. The officials also do not contest the district court's decision that the pretermination procedure and the first posttermination hearing were procedurally defective.

fact exists as to why Wilson was fired, a brief discussion of the legal protection afforded an employee's First Amendment right of association will be conducive to a better understanding of the factual issue in question.

A fundamental proposition in our constitutional jurisprudence is that government employment may not be conditioned upon a relinquishment of a constitutional right, including the rights to speech and association guaranteed under the First Amendment. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2473, 49 L.Ed.2d 547 (1976). No public employee can be dismissed from his job for a constitutionally infirm reason.

In determining whether Wilson was fired for a reason infringing upon his constitutionally-protected freedom of association, the court must apply a tripartite test derived from *Mt. Healthy City School District Board of Education v. Doyle, supra*, and *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See also Bickel v. Burkhart*, 632 F.2d 1251 (5th Cir. 1980); *Van Ooteghem v. Gray*, 628 F.2d 488 (5th Cir. 1980), *rehearing en banc granted*, 640 F.2d 12 (5th Cir. 1981). First, it must be determined whether the activity or speech in question constituted a "substantial" or "motivating" factor in the employee's being dismissed. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. at 287, 97 S.Ct. at 576. Second, it must be determined whether such activity or speech is constitutionally protected. *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), a case involving speech by a school teacher, announced the paradigm test for making this determination:

The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

Quoted in *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 564, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973). *See also Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). The fact that Wilson is a policeman does not obviate the need to balance the interests of the employee against the interests of the governmental employer: "[P]olicemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967); *Gasparinetti v. Kerr*, 568 F.2d 311 (3d Cir. 1977), *cert. denied*, 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978); *Kannisto v. City and County of San Francisco*, 541 F.2d 841 (9th Cir. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977). On the other hand, because being a policeman is public employment with unique characteristics, not the least being the promotion of safety of persons and property, several courts have read into the *Pickering* balance more deference to the state interest in preserving the morale and integrity of police departments than might be appropriate in other contexts. *Byrd v. Gain*, 558 F.2d 553 (9th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Muller v. Conlisk*, 429 F.2d 901 (7th Cir. 1970); *Gasparinetti v. Kerr, supra; see also Kelley v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976) (affording lessened protection to policeman's Fourteenth Amendment liberty interest). Third, if it is determined that the speech or activity is constitutionally protected, the court must ascertain whether the employee would have been fired even in the absence of such speech or activity. *Mt. Healthy City School District Board of Education v. Doyle, supra; Van Ooteghem v. Gray, supra*.

Wilson does not contest the district court's finding that association with Harlan Blackburn—a known and convicted felon, and reputedly a leader of organized crime—is not a constitutionally protected activity. Instead, he alleged that he was dismissed

because of his refusal to terminate his relationship with Susan Blackburn. He maintains on appeal that there remains a genuine issue as to a material fact, *i. e.*, why he was dismissed. He argues that his relationship with Susan was a substantial factor, and more significantly, that had he not reneged on his promise not to see Susan, he would not have been discharged. Because the district court found no genuine issue as to why Wilson was discharged, it did not make a determination as to whether association by a police officer with Susan, the adopted daughter of a convicted felon, is protected under the First Amendment. This determination entails considerations different from those concerning association with Harlan. If a substantial factor for dismissing Wilson was his continuing association with Susan, and if Wilson would not have been discharged had he not reneged on his promise not to see Susan, then the district court would have to make additional conclusions of law based on such motivation.

 In passing on Wilson's argument, we note the posture of this case. We are not reviewing a finding of fact made by the district court after a trial on the merits; rather, we must decide whether the district court properly granted summary judgment for the officials. In this posture, we must not only resolve all factual discrepancies in Wilson's favor, but also we must make all reasonable inferences in Wilson's favor. Constrained by this standard of review, we hold that a genuine issue remains as to whether Wilson was dismissed because of his refusal to stop associating with Susan. The district court, in rejecting Wilson's claim that he was dismissed for associating with Susan stated, "[T]he decision [of the police department] must be viewed in the totality of the circumstances." (Record on Appeal, p. 1172). In viewing the police department's decision in light of the "totality of the circumstances," the district court strayed from the requirement that all reasonable inferences be drawn in favor of the party opposing the summary judgment motion.

Several facts, and reasonable inferences therefrom construed favorably to Wilson, compel this conclusion. In his May 16 meeting with Chief Beary, Deputy Chief Aurbeck and Detective Dearing, Wilson promised not to see Susan, and made clear his intention not to see Harlan again. It was only when he reneged on his promise not to see Susan again that he was dismissed. He has at no time reneged on the understanding that he would not associate with Harlan again. The tape recorded interview with Detective Dearing, held after Wilson had reneged on his promise not to see Susan, was concerned primarily with establishing an accounting of Wilson's association with Susan and with a discussion about her background. Detective Dearing during this interview indicated that Susan had come under suspicion of a state and municipal agency. The memorandum given to Wilson when he was dismissed listed as one reason for dismissal, his dating Susan Blackburn. A reasonable inference from these facts is that while the police department believed Wilson would not see Harlan again, they had concluded they could no longer tolerate his dating Susan.

The district court rejected Wilson's claim that he was discharged because of association with Susan on the ground that, insofar as the officials were concerned about association with Susan, they were motivated only by a concern that this association would necessarily lead to an association with Harlan. The district court in effect made two findings in so reasoning. The first was a finding of fact that, insofar as the police department's discharge of Wilson was motivated by Wilson's refusal to terminate his relationship with Susan, it was to prevent contact with Harlan. The second was that it was necessary and appropriate to limit association with Susan to prevent association with Harlan. The district court assumed that because Wilson's relationship with Susan led to personal association with Harlan, even though Wilson had been cognizant of Harlan's reputation, there was no basis to assume that a continuing relationship with Susan would not again result in a recurrence of association with Harlan. (Record on Appeal, pp. 1173–74).

The first finding regarding motivation is defective for the same reasons we rejected the finding that Wilson was dismissed for association with Harlan. Constrained by the standard for review of summary judgments, we conclude that Wilson has submitted sufficient evidence to make reasonable the inference that a substantial factor in his termination was his refusal to refrain from seeing Susan, and not for any concern that this would necessarily lead to association with Harlan. The officials correctly assert that the fact that Wilson was permitted to date Susan until this did in fact lead to association with Harlan is strong evidence that the department was concerned that the relationship with Susan would lead to recurring association with Harlan. Pointing in the other direction, however, is the evidence that Wilson was originally permitted to date Susan, assuming he could avoid contact with Harlan, and the evidence that Wilson was discharged only when he refused to quit seeing Susan, notwithstanding his willingness to avoid contact with Harlan.

■ We also find improper, in the summary judgment context of this case, the finding that terminating Wilson's association with Susan was necessary to prevent association with Harlan. Any restriction on an individual's right of association must be closely drawn in order to avoid unnecessary abridgement of associational freedoms. *El-*

*rod v. Burns,* 427 U.S. at 362–63, 96 S.Ct. at 2684–2685. *Buckley v. Valeo,* 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 (1976); *Gasparinetti v. Kerr,* 568 F.2d 311 (3d Cir. 1977). If it is determined at trial that the officers were motivated by a belief that any association with Susan would necessarily result in contact with Harlan, then a determination would have to be made of whether continuing the relationship with Susan presented an undue risk of association with Harlan. In this summary judgment context, we think a reasonable inference is that Wilson could avoid association with Harlan while continuing to see Susan. Wilson had known Susan for approximately three and one-half years and had been dating her for almost a year and a half before he had any personal association with Harlan.[12] Wilson had association with Harlan only by express invitation of Susan. This suggests that a conscious effort by Wilson to avoid seeing Harlan, even while continuing to date Susan, could be successful.[13]

An unusual feature in this case bolsters our conclusion that summary judgment was inappropriate. In their answer, and in their two amended answers to Wilson's complaint, the officials have in effect denied that Wilson was discharged for the reasons set forth in the memorandum he received on June 13 and relied upon by the district court.[14] The officials instead allege an af-

12. The record is unclear as when Harlan was incarcerated while Wilson was dating Susan, although it is clear that Harlan was not in prison for this entire period. (Record on Appeal, p. 634).

13. The officials argue that the district court's decision is supported by the fact that Wilson did come into contact with Harlan Blackburn two additional times when Harlan came by Susan's house at a time when Wilson was also there. (Supp. Record on Appeal, p. 42). Wilson revealed these contacts in a deposition taken April 2, 1976, and only indicated they occurred after his dismissal from the department. In testifying before the Civil Service Board on August 5, 1975, Wilson indicated he had avoided up to that time all contact with Harlan since the last dinner with the Blackburn family. (Record on Appeal, p. 640). Because these two contacts occurred after Wilson had been dismissed and possibly after his appeal had been

denied, a reasonable inference is that he no longer felt bound by his promise not to see Harlan again. Accordingly, in the posture of summary judgment, this fact does not make unreasonable the conclusion that Wilson could avoid seeing Harlan.

14. In his amended complaint, Wilson set forth a verbatim restatement of the June 13 memorandum as the reasons for his discharge. (Wilson's Amended Complaint, ¶ 15, Record on Appeal, p. 35) In their answer and amended answers, the officials have consistently denied Wilson's allegation with this verbatim restatement. It is questionable whether this denial is an oversight as the police officers have persisted in denying Wilson's allegation even after the discrepancy was pointed out to them by Wilson's counsel during the hearing on the summary judgment motions. After this hearing, the officials filed their second amended complaint, again containing a denial of Wilson's

firmative defense that Wilson associated socially with Harlan Blackburn after receiving specific instructions to the contrary from Chief Beary.[15] Thus, the officials' pleadings allege, as the only reason that Wilson was discharged, that he associated socially with Harlan Blackburn in violation of specific instructions. On the other hand, and inconsistently, the affidavits and testimony offered by the officials in support of their motion for summary judgment tend to support the reasons for the discharge as set out in the June 13 memorandum, *i. e.*, for dating Susan and for seeing Harlan on the two designated occasions before receiving specific instructions otherwise.

Fed.R.Civ.P. 56(c) states that summary judgment shall be granted if the pleadings, together with other materials on file, shall show there is no material issue of fact. The language is mandatory, requiring that pleadings be included among those documents submitted in support of a motion for summary judgment. Consistent with this reading, courts have stated that a district court is obligated to consider not only material specifically offered in support of the motion, but also must consider all pleadings, depositions, answers to interrogatories, and admissions properly a part of the record. *Smith v. Hudson*, 600 F.2d 60 (6th Cir.), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979); Moore, *Federal Practice*, ¶ 56.13[2] (1976) ("[W]hile the pleadings are to be considered on a motion for summary judgment, they do not have controlling force.") The officials have in effect pleaded that Wilson was dismissed because he continued to associate with Harlan Blackburn after receiving specific instructions to the contrary. This fact is not supported by the officials' affidavits or testimony and is expressly controverted by Wilson. While the denial by the officials of the reasons stated in the June 13 memorandum in their pleadings may be a mistake, it is a

mistake which should not be overlooked or resolved on a summary judgment motion. Nor do we believe it appropriate for the district court to rely on this memorandum in light of the officials' denial of it in their pleadings. We do not imply that a movant for summary judgment necessarily loses if there is any discrepancy between his pleading and the facts presented in support of his motion. In this case, however, motivation is material, indeed crucial, and the inconsistency is too important to be overlooked. Moreover, the officials have offered no support for their affirmative defense, and have in some cases made sworn statements inconsistent with this pleading.[16] This inconsistency reinforces our conclusion that a material issue of fact remains as to exactly why Wilson was discharged.

Wilson clearly exercised poor judgment in allowing his friendship with Susan to lead to social association with Harlan. On appeal, Wilson has not attempted to defend his association with Harlan or to attack the district court's holding that a police department has a compelling interest to limit off-duty association with felons. He has limited his attack on this issue to whether there was a genuine issue of fact as to why he was discharged. Our holding is similarly limited. There remain questions as to the motivation of the police department and the extent to which Wilson's refusal to terminate his association with Susan played a role in the officials' actions. Depending on the determination of these questions, the district court will have to determine whether association with Susan is protected by the First Amendment and, perhaps, whether restrictions on association with Susan were necessary to insure no further association with Harlan.

## VAGUENESS CLAIM

■ Wilson claims that Rule 35 of the Civil Service Rules and Sections 3.35.13.35,

---

allegation with its verbatim quote of the June 13 memorandum.

**15.** The record, however, is devoid of any factual support that Wilson ever saw Harlan Blackburn after his discussions with Chief Beary and before his dismissal.

**16.** For example, Chief Beary's affidavit incorporates the reasons in the June 13 memorandum as reasons why he dismissed Wilson.

3.35.13.7, and 3.35.13.39 of the Standard Operating Procedure Manual are constitutionally vague as applied to him insofar as he was dismissed for associating with Susan Blackburn. He in no way maintains that these regulations are vague if it is the case that he was dismissed because of his association with Harlan Blackburn. The district court did not address Wilson's claim since it concluded the substantial motivating factor behind the officials' action was concern over Wilson's association with Harlan.[17] On remand, if it is determined that a substantial motivating factor in Wilson's discharge was his continuing relationship with Susan, then his vagueness claim must be addressed.[18]

## PROCEDURAL DUE PROCESS CLAIM: SECOND HEARING

Wilson maintains that the second hearing before the City Commissioners did not comport with the district court's order of September 1, 1978, and did not comply with procedural due process. He argues that the notice of the second hearing did not specify the grounds on which the City Commission could overrule the Civil Service Board's decision. This is the only procedural due process attack he makes upon the second, remedial hearing before the City Commissioners. The October 4, 1978, letter from James A. Driver, Mayor of Winter Park, to Wilson sets forth the June 13 memorandum as containing the grounds on which Chief Beary would seek Wilson's termination before the City Commissioners. The district court correctly found that this letter gave Wilson adequate notice of the reasons his discharge would be sought at the remedial hearing. Accordingly, we find that the requirements of due process have been met in the October 26 and November 21 remedial hearings.

## DAMAGES FROM DEPRIVATION OF DUE PROCESS

We recall that there was an undisputed deprivation of procedural due process with respect to Wilson's pretermination rights and the first posttermination hearing before the City Commission.[19] If on remand

**17.** Because the district court found that Wilson had been dismissed only because of his association with Harlan Blackburn, it found that the regulations clearly applied to Wilson's conduct. It then concluded that he lacked standing to challenge the regulations as vague in other contexts. Wilson, for good reason, has chosen not to contest this ruling by the district court insofar as it is premised on his association with Harlan. Even in the context of the First Amendment, where traditional rules of standing governing constitutional adjudication have been relaxed, *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the Supreme Court has held that one may not challenge the vagueness of rules as they might hypothetically be applied to others if one's actions fall squarely within the ambit of the prohibitions. *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). *Accord Familias Unidas v. Briscoe*, 619 F.2d 391, 399 n.8 (5th Cir. 1980); *United States v. Albanese*, 554 F.2d 543 (2d Cir. 1977); *Kannisto v. City and County of San Francisco*, 541 F.2d 841 (9th Cir. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977).

**18.** If it is found that Wilson was dismissed in substantial part for associating with Susan Blackburn, then it would be helpful to determine whether he was told at the May 16 meet-ing that further association with Susan would be deemed a violation of the regulations. Wilson has stated under oath that at the May 16 meeting, Chief Beary did not state that seeing Susan would violate any regulation. (Supp. Record on Appeal, pp. 63 and 67–70). Wilson also states under oath that at one point during the meeting, Chief Beary indicated that in seeing Susan, Wilson had violated no "law" or "moral code." (Supp. Record on Appeal, p. 65). On brief to this court, Wilson maintains that he was affirmatively told that associating with Susan violated no regulation. If on remand the fact finder should find that at the May 16 meeting Wilson was told that continued association with Susan would violate regulations, then his vagueness as applied claim would be largely vitiated. *See United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 580, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973) (indicating that the existence of means to seek and obtain advice from agency on the validity of a proposed course of conduct is important in determining whether a regulation is impermissibly vague).

**19.** *See Glenn v. Newman*, 614 F.2d 467 (5th Cir. 1980); *Thurston v. Dekle*, 531 F.2d 1264 (5th Cir. 1976), *vacated on other grounds*, 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978).

it is determined that Wilson's substantive constitutional claims are meritless, the district court must still determine the damages to which Wilson is entitled for the solely procedural due process violation.

In a sworn interrogatory, Wilson specified that he was seeking punitive damages as a result of the deprivation of procedural due process. Without specifying the cause of the injury, he also indicated he was seeking compensatory damages consisting of back pay, educational benefits and retirement investments, from the date of his dismissal until November 21, 1978, the date of the procedurally proper hearing, as well as future losses after November 21, 1978. He also claimed damage to his career, his personal reputation, and mental anguish, again without specifying the cause. During a February 6, 1979, hearing on the renewed motions for summary judgment, the district court indicated its skepticism that Wilson would be able to prove any compensatory damages solely from the deprivation of procedural due process, citing *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Despite its skepticism that Wilson would be able to introduce such evidence, the district court made clear Wilson would have an opportunity at a later date to introduce evidence on the issue.[20] (Tr., Feb. 6, 1979, hearing, pp. 35–39).

The district court subsequently rendered its decision awarding Wilson only nominal damages on the procedural due process violation without having given Wilson the promised evidentiary hearing.[21] The district court found that any procedural due process claim had been cured by the second proceeding before the City Commission, and that plaintiff had offered no proof of damages resulting solely from the deprivation of procedural due process. It continued to state that it did not believe Wilson could offer proof of any damages because of *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

■ Insofar as the district court believed *Carey v. Piphus* limited possible damages from violations of procedural due process to nominal damages, it was mistaken. With respect to deprivation of procedural due process, that case held only that "*in the absence of actual injury,* [plaintiffs] are entitled to recover only nominal damages." 435 U.S. at 248, 98 S.Ct. at 1044 (emphasis added). *Carey v. Piphus* makes it clear that if a plaintiff can prove actual damages resulting solely from the deprivation of procedural due process, the plaintiff is entitled to damages. The Supreme Court stated:

> Insofar as petitioners contend that the basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights, they have the better of the argument. Rights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests, and their contours are shaped by the interests they protect.

435 U.S. at 254, 98 S.Ct. at 1047.

■ With respect to Wilson's actual damage claims, we think he should be allowed the opportunity to present his evidence of damages resulting from the deprivation of procedural due process. Although we too are skeptical that Wilson will be able to prove that deprivation of procedural due process contributed to damage to his career and reputation, he must be given the opportunity, as the district court promised. *Rodriguez de Quinonez v. Perez*, 596 F.2d 486 (1st Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979) (remanding for determination whether procedural due process violation contributed to damage to reputation). One of the elements of damage the Supreme Court indicated was recoverable for denial of procedural due process

---

**20.** The district court indicated that the evidentiary hearing with respect to damages would be restricted to compensatory damages only, with no evidence allowed with respect to the claim for punitive damages. (Tr., Feb. 6, 1979, hearing, pp. 35 & 37). The district court did not indicate why it would hear no evidence with respect to punitive damages.

**21.** The district court offered no reasons as to why Wilson was not afforded the promised evidentiary hearing.

was for mental and emotional distress. The Court was careful to note that such damage may not be presumed, but must be proved by the plaintiff. 435 U.S. at 262, 98 S.Ct. at 1051. Wilson has adequately pleaded such damages and should be allowed to present his evidence. However, if the emotional distress or any damage to Wilson's career and reputation would have been incurred even if proper procedures had been used in discharging him—*i. e.*, if such injuries were caused not by the pretermination procedural due process violation, but rather were caused by the discharge itself which this part of our opinion assumes was justified—then he would not be entitled to such damages. *Carey v. Piphus*, 435 U.S. at 259–264, 98 S.Ct. at 1050–1052.

The Supreme Court in *Carey v. Piphus* expressed no opinion as to whether punitive damages might be awarded in a proper case under § 1983 with the specific purpose of deterring or punishing violations of constitutional rights. 435 U.S. at 257, n.11, 98 S.Ct. at 1049, n.11. This circuit, however, has held that punitive damages may be awarded in a § 1983 action even without actual loss, despite local law to the contrary. *McCulloch v. Glasgow*, 620 F.2d 47 (5th Cir. 1980); *Mansell v. Saunders*, 372 F.2d 573 (5th Cir. 1967); *see also Brown v. Bullard Independent School District*, 640 F.2d 651 (5th Cir. 1981). Accordingly, on remand the district court should hear whatever evidence Wilson may present on the punitive damage issue.

Of course, if Wilson is unable to prove any actual damage from the deprivation of procedural due process, he may receive nominal damages under *Carey v. Piphus*, 435 U.S. at 266–67, 98 S.Ct. at 1053–1054.

The question of whether Wilson may recover back pay, educational benefits and retirement benefits for solely a procedural due process violation is more difficult in this circuit. Wilson argues strenuously that he is entitled to these payments from his dismissal on June 13 until the procedurally adequate hearing on November 21, 1978.

An analogous question was considered by the Supreme Court in *Carey v. Piphus*. There students were suspended from school without being afforded appropriate procedural due process. The Seventh Circuit remanded the case to the district court, holding, inter alia, that "the District Court should have considered evidence submitted by . . . [the students] to prove the pecuniary value of each day of school that they missed while suspended," but further holding that such damages would not be recoverable if the school officials "showed on remand 'that there was just cause for the suspension[s] and that therefore . . . [the students] would have been suspended even if a proper hearing had been held.'" 435 U.S. at 252, 98 S.Ct. at 1046. In this regard, the Supreme Court held:

> In this case, the Court of Appeals held that if petitioners can prove on remand that "[the students] would have been suspended even if a proper hearing had been held," 545 F.2d at 32, then . . . [the students] will not be entitled to recover damages to compensate them for injuries caused by the suspensions. The court thought that in such a case, the failure to accord procedural due process could not properly be viewed as the cause of the suspensions. [Citations omitted.] The court suggested that in such circumstances, an award of damages for injuries caused by the suspensions would constitute a windfall, rather than compensation, to . . . [the students]. [Citations omitted.] We do not understand the parties to disagree with this conclusion. Nor do we.

435 U.S. at 260, 98 S.Ct. at 1050. The *Carey* students' loss of the value of their time in school is analogous to the instant plaintiff's loss of the value of his time at work, *i. e.*, back pay. The analogy was explicitly recognized by the Supreme Court in *Carey*, when it referred to, and implicitly disapproved of, four circuit court cases in the public employee context. 435 U.S. at 260, n. 15, 98 S.Ct. at 1050, n. 15. In all four cases,[22] the circuit courts had awarded

---

**22.** *Zimmerer v. Spencer*, 485 F.2d 176 (5th Cir. 1973); *Horton v. Orange County Board of Education*, 464 F.2d 536 (4th Cir. 1972); *Thomas v. Ward*, 529 F.2d 916 (4th Cir. 1975); *Burt v.*

back pay for solely a procedural due process violation from the time of termination until the time of either a procedurally adequate posttermination hearing or the time the employee's property interest in his employment would have ceased. The Supreme Court's note clearly indicates a belief that such awards of back pay were improper. Since *Carey*, those circuits which have addressed the issue have uniformly held or stated that where there is only a procedural due process violation which is subsequently cured by a posttermination hearing, the plaintiff may not collect back pay. *Kendall v. Board of Education of Memphis City*, 627 F.2d 1 (6th Cir. 1980); *Bishop v. Tice*, 622 F.2d 349 (8th Cir. 1980); *Polos v. United States*, 621 F.2d 385 (Ct.Cl.1980); *Taliaferro v. Willett*, 588 F.2d 428 (4th Cir. 1978); *Burt v. Abel*, 585 F.2d 613 (4th Cir. 1978); *Hernandez del Valle v. Santa Aponte*, 575 F.2d 321 (1st Cir. 1978) (dictum); *D'iorio v. County of Delaware*, 592 F.2d 681 (3d Cir. 1978) (dictum).

This circuit has not addressed the question of whether *Carey v. Piphus* precludes awards of back pay for violations of only procedural due process. Three cases in this circuit decided since *Carey* have indicated those panels' assumption that procedural due process does merit an award of back pay, but with no mention of *Carey* and no indication that the pertinent *Carey* language was brought to the attention of those panels.

In *Glenn v. Newman*, 614 F.2d 467 (5th Cir. 1980), a policeman was dismissed with a pretermination procedure which was constitutionally defective. At a later posttermination proceeding complying with the requirements of due process, the discharge of the policeman was reaffirmed. Although

there was no claim of a violation of a substantive constitutional right and although the posttermination proceeding cured any constitutional due process deficiency in the pretermination proceeding, we remanded for a determination of back pay from the time of the policeman's termination until the adequate posttermination proceeding. 614 F.2d at 473.[23] In *Thompson v. Bass*, 616 F.2d 1259 (5th Cir. 1980), *cert. denied*, 449 U.S. 983, 101 S.Ct. 399, 66 L.Ed.2d 245 (1980), we cited *Glenn v. Newman* but not *Carey* when we indicated that a posttermination hearing complying with procedural due process and resulting in a reinstatement of the plaintiff and an award of back pay from the time of dismissal, cured any constitutionally defective pretermination procedure. Our remark in *Thompson* cannot be deemed a holding since we there were merely indicating that the steps already taken by the public employer to remedy the pretermination deficiency had cured any procedural due process violation. Similarly, dicta in *Jackson v. Stinchcomb*, 635 F.2d 462 (5th Cir. 1981), expressly approved of *Glenn v. Newman*'s holding that back pay is an appropriate remedy for such purely procedural due process violations, again without mention of *Carey*.

It is the firm rule of this circuit that we cannot disregard the precedent set by a prior panel, even though we perceive error in the precedent. Absent an intervening Supreme Court decision which changes the law, only the en banc court can make the change. *Hernandez v. City of Lafayette*, 643 F.2d 1188 (5th Cir. 1981); *Fulford v. Klein*, 529 F.2d 377 (5th Cir. 1976), *majority opinion adopted by en banc court*, 550 F.2d 342 (5th Cir. 1977); *Davis v. Estelle*, 529 F.2d 437 (5th Cir. 1976). Application of

Board of Trustees of Edgefield County School District, 521 F.2d 1201 (4th Cir. 1975) (Opinion of Winter, J.).

**23.** Although the *Glenn v. Newman* panel relied upon the pretermination procedural due process requirements established by *Thurston v. Dekle*, 531 F.2d 1264 (5th Cir. 1976), *vacated on other grounds*, 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144, *modified*, 578 F.2d 1167 (5th Cir. 1978), the *Glenn* court did not cite *Thurston* for the proposition of law set out in the text accompanying this footnote. However, this court's first opinion in *Thurston* had enunciated the same rule of law. 531 F.2d at 1269. After remand of the case from the Supreme Court, the relevant portion of the first *Thurston* opinion was deleted, without, however, any explicit or implicit expression of disapproval of the point of law.

the foregoing rule would ordinarily indicate that we must now follow the holding in *Glenn v. Newman*, since there has been no subsequent Fifth Circuit *en banc* case or Supreme Court case to the contrary. However, we are confronted with an unusual and delicate situation, a conflict between our own *Glenn v. Newman* decision and the previous Supreme Court decision in *Carey v. Piphus*. The *Glenn v. Newman* panel did not purport to interpret *Carey v. Piphus*; had it done so, of course, we would be bound by its interpretation. It did not mention *Carey v. Piphus*, and we have examined the briefs and ascertained that *Carey* was not called to the attention of the *Glenn* panel. The appropriate resolution of the quandary we face is suggested by our recent decision in *Hernandez v. City of Lafayette*, 643 F.2d at 1192–93. There, this court held that when a panel is confronted with two contradictory holdings in this circuit, the court in the latter case would be deemed without power to disregard the precedent established by the earlier panel. Since the *Carey v. Piphus* holding was binding upon the *Glenn* panel, just as a previous Fifth Circuit case would have been, we similarly must deem the *Glenn v. Newman* court to have been without power to disregard the Supreme Court's precedent in *Carey v. Piphus*. Accordingly, we hold that, under the authority of *Carey*, Wilson may not recover—as damages for the procedural due process violation—back pay or educational and retirement benefits which would have accrued had Wilson worked from the date of his procedurally improper discharge on June 13 until the date of the procedurally proper hearing on November 21, 1978.

## ATTORNEY'S FEES

 Wilson asked for attorney's fees below. The district court denied such fees on grounds that because Wilson had been awarded only nominal damages for the procedural due process violation, he had won a "moral victory" at most, citing *Huntley v.*

*Community School Board of Brooklyn*, 579 F.2d 738 (2d Cir. 1978). Wilson does not argue to this court that he is entitled to attorney's fees if he obtains only nominal damages on remand.[24] Instead, he asks that we direct attorney's fees be granted if he prevails on his substantive constitutional claim or on his request for damages resulting from the procedural due process claim. There is no reason to believe that if Wilson prevails on either of these claims, the district court will not award him the appropriate attorney's fees. If Wilson should prevail only on his claim for damages resulting from procedural due process, then the customary rule would apply, that he is entitled to attorney's fees unless special circumstances render such an award unjust. *McCulloch v. Glasgow, supra*, (requiring this rule be applied on remand to determine whether damages resulted from a procedural due process violation in condemnation of property.) Should Wilson be successful on only one claim, it is appropriate that attorney's fees be awarded only for the work on the issue on which the plaintiff was successful. *Familias Unidas v. Briscoe, supra; see also Hardy v. Porter*, 613 F.2d 112, 114 (5th Cir. 1980). Also, if Wilson should prevail on remand, any award should include fees for services rendered on this appeal and remand therefrom. *McCulloch v. Glasgow*, 620 F.2d 47 (5th Cir. 1980); *Kingsville Independent School District v. Cooper*, 611 F.2d 1109 (5th Cir. 1980).

Wilson raises other arguments to this court which we find to be meritless and reject.

VACATED AND REMANDED FOR ACTION CONSISTENT WITH THIS OPINION.

---

24. In discussing the role of compensatory damages in deterring § 1983 actions, the Supreme Court noted the additional deterrence value the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C.A. § 1988 (West Supp. 1981), provides. *Carey v. Piphus*, 435 U.S. at 257, n.11, 98 S.Ct. 1042, 1049, n.11, 55 L.Ed.2d 252.