IN THE MATTER OF: MILDRED VOELCKER MEDLIN, RESPONDENT

No. 829DC50

(Filed 5 October 1982)

**Insane Persons § 1.2— involuntary commitment of mentally ill—competent evidence supporting finding of dangerousness to self**

There was competent evidence to support a finding that respondent was "dangerous to herself" as defined by G.S. § 122-58.2(1) where the records revealed that at the time of the commitment hearing the respondent was suffering from psychotic depression and paranoid schizophrenia; that she had been unemployed for almost one year, having left her job because she felt she was being harassed by a married man at work; that she had not attempted to seek other employment; that respondent had been living in her car for two weeks prior to the hearing and it appeared that the only sustenance which respondent received was that which her daughter brought to the car for her; and that her daughter feared that respondent would die of carbon monoxide poisoning if she were to continue to live in her car through the rest of the winter months.

APPEAL by respondent from *Senter, Judge.* Order entered 29 October 1981 in District Court, GRANVILLE County. Heard in the Court of Appeals 1 September 1982.

On 24 October 1981 Charlotte Medlin Kilpatrick initiated proceedings for the involuntary commitment of her mother, Mildred Voelcker Medlin, pursuant to Ch. 122, Article 5A, of the North Carolina General Statutes. She alleged respondent was a mentally ill person who was dangerous to herself. On the basis of this petition, a magistrate ordered that respondent be taken into custody in order that she might be examined by a qualified physician.

Respondent was then examined by Dr. Lillian Trexler in Chapel Hill, North Carolina. Dr. Trexler determined that respondent was mentally ill and potentially dangerous to herself or others.

Respondent was next transferred to John Umstead Hospital where she was examined by Dr. M. Chatterjee and Dr. Henry B. Burton. Both physicians found respondent to be mentally ill and potentially dangerous to herself or others. Dr. M. Chatterjee diagnosed respondent as suffering from psychotic depression, stating that she talked constantly, in a loose rambling style, was suspicious, and that she had not been eating well. Dr. Henry Burton diagnosed respondent as suffering from paranoid schizophrenia, observing that her speech was rapid, excessive and

In re Medlin

often irrelevant, her affect was blunted and she described persecutory ideas. He also stated that she believed others are "harming" her.

The matter was heard at John Umstead Hospital, Granville County, on 29 October 1981, respondent being present and represented by counsel. At the hearing Charlotte Kilpatrick, respondent's daughter, testified that respondent had quit her job approximately one year ago and had not been employed since that time. She testified that respondent was living with her sister, but that for the last two weeks she had been living in her car, in spite of the cold weather. She also stated that respondent's explanations were irrational; that respondent said she moved from her sister's house to her own car because her sister would not allow her to smoke in the house. She testified that respondent felt people were harassing her and that, in her opinion, respondent was incapable of caring or providing for herself in her present state. She stated that respondent had refused to seek treatment on her own, but had been hospitalized at John Umstead Hospital for a period in 1967.

Respondent testified in her own behalf and denied the allegations. She felt her only problem was that she had neither money nor a job. She stated that the only reason she lived in her car was because she had nowhere else to go after she and her sister argued about smoking in the house. She stated that although the car was cold and uncomfortable, she was more comfortable in the car than in the house after her disagreement with her sister. Respondent testified that her sister had not invited her back into the house except occasionally for some coffee or food and that she had refused those invitations. Respondent felt her sister was trying to tell her that she did not want respondent in her home. Respondent acknowledged that there were problems between her daughters and herself, and that she was also having problems with a disc jockey who discussed respondent's problems on the air. She related that she had quit her job because a married man had been harassing her, and that her brother-in-law had also been sexually harassing her. She stated that people were trying to run and discipline her life and that she had recently been experiencing quite a bit of stress. She stated that she could take care of herself and was not dangerous to herself or to others. Respondent also expressed a willingness to seek counselling at a local mental

health center if released. She testified that she had been hospitalized previously for depression.

At the conclusion of the hearing, the court made the following findings of fact:

> The patient (is) (is not) (mentally ill) (inebriate) (mentally retarded with an accompanying behavior disorder), as defined in N.C.G.S. 122-36, suffering with a mental disorder, diagnosed as Psychotic Depression—Paranoid Schizophrenia.

(x) The patient is dangerous to himself in that:

> (x) Within the recent past, the patient has acted in such a manner as to evidence that he would be unable without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of his daily responsibilities and social relations, or to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and, there is a reasonable probability of serious debilitation to the patient within the near future unless adequate treatment is afforded the patient in that in her present mental condition she is unable to provide for her basic needs of food, clothing and shelter. She is unemployed and she presently sleeps in her car. Without the proper basic needs her mental and physical health would deteriorate substantially.

From the foregoing findings, the court concluded as a matter of law that respondent was mentally ill and dangerous to herself and ordered that the respondent be committed to John Umstead Hospital or Veterans Administration Hospital for a period of thirty days or until such time as she is discharged according to law. From this ruling, the respondent appealed.

*Attorney General Edmisten by Associate Attorney Wilson Hayman for the State.*

*Special Counsel for the Mentally Ill Stephen D. Kaylor for the respondent.*

MARTIN (Robert M.), Judge.

N.C. Gen. Stat. § 122-58.7(i) (1981) requires as a condition to a valid commitment order that the district court find two distinct

facts by clear, cogent, and convincing evidence. The court must first determine that the respondent is mentally ill or inebriate. Secondly, the court must find that the respondent is dangerous to herself or others.

The trier of fact alone must determine whether the evidence presented is clear, cogent and convincing. Our only function on appeal is to determine whether there was any competent evidence to support the factual findings made. *In re Monroe*, 49 N.C. App. 23, 270 S.E. 2d 537 (1980).

Respondent does not argue that there is insufficient evidence to support the court's finding on the issue of mental illness. She does contend that there was no competent evidence supporting a finding of dangerousness to self, either in the facts recorded in the court's order or in the record.

The phrase "dangerous to herself" is defined by N.C. Gen. Stat. § 122-58.2(1) (1981) as follows:

1. The person has acted in such manner as to evidence:

   I. That he would be unable without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of his daily responsibilities and social relations, or to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety; and

   II. That there is a reasonable probability of serious physical debilitation to him within the near future unless adequate treatment is afforded pursuant to this Article. A showing of behavior that is grossly irrational or of actions which the person is unable to control or of behavior that is grossly inappropriate to the situation or other evidence of severely impaired insight and judgment shall create a prima facie inference that the person is unable to care for himself;

The statutory language establishes a two prong test for dangerousness to self. The first prong deals with self-care ability regarding one's daily affairs. The second prong requires a specific finding of a probability of serious physical debilitation resulting

from the more general finding of lack of self-caring ability. The facts supporting this danger must be recorded by the trial court. *In re Caver*, 40 N.C. App. 264, 252 S.E. 2d 284 (1979).

We think it is clear from the facts presented in the record and those recorded in the court order that, because of her mental instability, the respondent was unable to tend to her basic daily needs and that as a result there was a probability of serious physical debilitation within the near future.

. The record reveals that at the time of the commitment hearing the respondent had been unemployed for almost one year, having left her job because she felt she was being harassed by a married man at work. There was no evidence presented that she had thereafter attempted to seek other employment. The respondent had been living in her car for two weeks prior to the hearing and it appeared that the only sustenance which respondent received was that which her daughter brought to the car for her. The record also revealed the fear of respondent's daughter that respondent would die of carbon monoxide poisoning if she were to continue to live in her car through the rest of the winter months.

This court has previously recognized two purposes for our State's involuntary commitment statute. *In re Doty*, 38 N.C. App. 233, 247 S.E. 2d 628 (1978). Those two goals are 1) to allow temporary withdrawal from society of those who may be dangerous and 2) to provide treatment. We feel that the latter purpose was served by respondent's involuntary commitment.

While we agree that the State cannot commit to a mental hospital any unemployed person who has no home, we feel that such is not the case here. As the court pointed out in *In re Lee*, 35 N.C. App. 655, 242 S.E. 2d 211 (1978), "G.S. 122-58.2(1) provides that as used in Article 5A (Involuntary Commitment) '[t]he phrase 'dangerous to himself' includes, but is not limited to, those mentally ill or inebriate persons who are unable to provide for their basic needs for food, clothing, or shelter, . . . .' " 35 N.C. App. at 657, 242 S.E. 2d at 212-13. In that case the court upheld the commitment order on the basis that respondent could not be relied upon to take necessary medication and did not have enough income to "cover the costs of maintaining shelter for respondent and providing him with food, clothing, fuel and other basic needs." Id. The same reasoning can be applied to the case at

hand, since respondent cannot be relied upon to maintain the proper diet necessary to her welfare and she has no income to cover the expense of food, clothing, fuel or shelter. This court has previously indicated that failure of respondent to properly care for her medical needs, diet, grooming and general affairs would meet the required test of dangerousness to self in G.S. 122-58.7(i). See *In re Holt*, 54 N.C. App. 352, 353, 283 S.E. 2d 413, 414 (1981).

Without treatment respondent's death or injury was likely to occur by uneventful slow degrees or by misadventure. Since the statute does not require a showing that violent danger is threatened by respondent to herself, we feel that the evidence presented adequately supports a finding that there is reasonable probability of serious physical debilitation to respondent within the near future unless she receives adequate treatment.

The order appealed from is

Affirmed.

Chief Judge MORRIS and Judge BECTON concur.