IN THE MATTER OF: DAVID LARRY WOODIE

No. 9325DC1149

(Filed 20 September 1994)

1. **Hospitals and Medical Facilities or Institutions § 58 (NCI4th)— involuntary commitment—no form in file—no error**

The trial court did not err in not dismissing the involuntary commitment proceeding and hearing the matter without having a petition for an order to take appellant into custody in the court file as required by N.C.G.S. § 122C-261, since appellant's involuntary commitment was performed pursuant to N.C.G.S. § 122C-262 which provides for a special emergency procedure for individuals needing immediate hospitalization, and the evidence indicated that, immediately prior to being hospitalized, appellant abruptly left the doctor's office saying he was going to kill himself.

**Am Jur 2d, Hospitals and Asylums § 12.**

2. **Hospitals and Medical Facilities or Institutions § 58 (NCI4th)— involuntary commitment—failure of doctor to check appropriate box**

The trial court did not err in failing to dismiss the involuntary commitment against appellant because the report of examination and recommendation to determine the necessity for involuntary commitment signed by one of the examining physicians failed to include an "x" in the box beside "dangerous to self," since that physician wrote a description of appellant on the form which clearly indicated that he was dangerous to himself.

**Am Jur 2d, Hospitals and Asylums § 12.**

3. **Hospitals and Medical Facilities or Institutions § 59 (NCI4th)— involuntary commitment—sufficiency of findings and conclusions**

The trial court's order contained sufficient findings of fact to support a conclusion of law that appellant was mentally ill or mentally retarded with an accompanying behavior disorder and dangerous to himself or others, and failure of the court to check the box "mentally ill" or "mentally retarded" supporting his conclusions of law did not constitute reversible error.

**Am Jur 2d, Hospitals and Asylums § 12.**

Appeal by respondent from order entered 14 June 1993 by Judge Jonathan L. Jones in Catawba County District Court. Heard in the Court of Appeals 30 August 1994.

*Attorney General Michael F. Easley, by Associate Attorney General Rebecca R. Phifer, for petitioner-appellee.*

*E. X. de Torres for respondent-appellant.*

JOHNSON, Judge.

A hearing on the involuntary commitment of appellant David Larry Woodie was held on 14 June 1993 at Catawba Memorial Hospital. Evidence presented at the hearing for the State showed the following: Appellant's wife, Angela Woodie, testified that on 1 June 1993, appellant took an overdose of medicine around 10:30 p.m.; that she got up and noticed appellant's medicine bottles were empty and she called 911 for help; that the 911 officers arrived and convinced appellant to go with them to the hospital; that they went to Lincoln County Hospital where appellant was treated from 1 June 1993 until 7 June 1993; and that appellant was in the intensive care unit for three days. She testified further that before appellant was released from the hospital on 7 June 1993, Dr. Robert Reed scheduled an appointment for appellant with Dr. Tong Su Kim; that she, appellant's mother and appellant went to see Dr. Kim; that appellant left Dr. Kim's office after being told he needed to be hospitalized; that appellant's mother said when appellant left the office, "[H]e said they were going to lock him up and he was going to kill hisself"; that appellant had also tried to harm himself on 7 July 1992; and that "off and on" he had made statements about harming himself and that "sometimes when you'd think everything was okay . . . he would just, you know, make the statement he wanted to die."

**IN RE WOODIE**

[116 N.C. App. 425 (1994)]

On cross-examination, Mrs. Woodie testified that appellant had not expressed any thoughts of killing himself since his Lincoln County hospitalization; that in July 1992, when appellant had tried to harm himself, he had taken an overdose of medicine and was hospitalized in Lincoln County Hospital and Frye Medical Center; that while at Frye Medical Center, appellant just "walked out on the streets" one day, "barefooted" and without money and that the next day they admitted appellant to Catawba Memorial Hospital; and that appellant had been seeing Dr. Kim since 7 July 1992 and had been treated for his psychiatric condition by another doctor since 4 January 1993. She also testified that appellant had a back condition and previously had an operation for two herniated discs and is on pain medication; that appellant has carpel tunnel syndrome in both hands; that appellant had been working with her uncle but was told or believed that her uncle was going to terminate his employment; that on 1 June 1993, appellant was not picked up by her uncle for work; and that appellant talked to her uncle later in the afternoon and was upset by the conversation. She testified also that appellant first had back problems on 23 September 1991; that after his back surgery, appellant told his treating physician that "something was different about his mind" and that "nothing meant anything anymore"; and that appellant kept getting worse mentally and slept a lot.

Next to testify for the State was Dr. Kim. Dr. Kim testified that he saw appellant in his office on 7 June 1993 and while talking to Mrs. Woodie, appellant left his office; that Dr. Kim talked to a magistrate and contacted the police; that about 1:30 p.m., appellant was brought into the emergency room at Catawba Memorial Hospital and that Dr. Kim examined appellant the next day; that Dr. Kim had treated appellant the previous summer for severe depression which included shock treatment; that Dr. Kim had seen appellant in April 1993 and appellant was in a good mood, smiling and happy, and appellant felt like he was doing quite well. Dr. Kim further testified that appellant was rather argumentative, at times angry, at times calm; that he believed appellant "represents a pretty high risk of suicide if we permit him to do so"; that appellant has a tendency to be obsessive/compulsive; and that Dr. Kim recommended at least a thirty day inpatient commitment for appellant. On cross-examination, Dr. Kim testified that he signed the form necessary for the involuntary commitment on 7 June 1993, and that in order to commit someone, you have to make a finding that he is mentally ill and then whether he is dangerous to himself or dangerous to others; that on the form he

filled out for appellant, he did not mark the box beside danger to self or danger to others, and that it was his mistake to not originally mark that and that finding as such was necessary to commit appellant involuntarily; that on previous occasions, appellant had discussed with him his frustration or his anger at his inability to work; that the trigger mechanism which caused the overdose incident on 1 June 1993 was the problem with the loss of his employment; and that Dr. Kim had seen appellant since 8 June 1993 and that they had

> engaged in a hot argument about his saying society doesn't allow its members to commit suicide, insisting he has a right to do away with himself. And also he was unable to see that, you know, it's not his own private affair. That should he succeed, his wife, his mother would suffer. . . . And he said in his own words that they'll suffer for a while, but they'll get over it.

At the conclusion of petitioner's evidence, petitioner offered into evidence certified copies of appellant's medical records.

Respondent testified on his own behalf. Respondent testified that in late May 1993, he was working for his wife's uncle; that after an incident at work over a concrete mixture, he thought he was going to be no longer working; that on 1 June 1993, he had a phone conversation with his wife's uncle and was told he would no longer be needed to work; that after he heard that, he "felt like the world had just opened up and dropped all their problems on me. I mean, I just felt I didn't have a chance"; that later that same evening, he took an overdose of pills and that "this time I planned to succeed"; that previously he had an operation on his neck vertebrae for a herniated disc and was disabled after the operation; that he had worked at the same job for fourteen years at J. P. Stevens as a field technician prior to his injury which included training other workers, and that because of economic reasons, they asked to demote him to a warehouseman, pushing a hand truck; that on 7 June 1993, after a discussion with Dr. Reed in Lincoln County, he agreed to talk to Dr. Kim; that he did not expect Dr. Kim to recommend he be involuntarily committed; that he has talked with Dr. Kim while at Catawba Memorial Hospital on several occasions about killing himself; that since his admission here, things have changed for appellant and that he knows he has a purpose in life and that he has to go back out there and make an effort to try; that he would be willing to see Dr. Kim or some other doctor on an outpatient basis; that he knows he "done a mistake when I done the overdose and I should have went before somebody and tried to talk it

out"; that since his back surgery, he has felt like his mind was different and that it was like "when I come to they had took my mind out and transplanted somebody else's mind."

The trial court found that appellant met the criteria for continuing court ordered treatment as an inpatient up to thirty days followed by outpatient treatment up to sixty days. Appellant appealed to this Court.

Initially, we note that this appeal is one which is certainly moot because appellant was involuntarily committed for a thirty day period over a year ago. Nonetheless, we choose to address appellant's arguments.

[1] Appellant first argues on appeal that the trial court erred in not dismissing the involuntary commitment, and hearing the matter, without having a petition for an order to take appellant into custody in the court file as required by North Carolina General Statutes § 122C-261 (1993). The State contends that appellant's involuntary commitment was performed pursuant to North Carolina General Statutes § 122C-262 (1993), which provides for a "[s]pecial emergency procedure for individuals needing immediate hospitalization." We agree with the State in that defendant required "immediate hospitalization to prevent harm to himself," pursuant to North Carolina General Statutes § 122C-262, evidenced by the testimony that when appellant abruptly left the doctor's office, he said he was going to kill himself. We overrule this assignment of error.

[2] Defendant next argues that the trial court erred in not dismissing the involuntary commitment against appellant as the report of examination and recommendation to determine the necessity for involuntary commitment signed by Dr. Kim, the examining physician, failed to state that appellant was a danger to himself or to others.

It is true that under North Carolina General Statutes § 122C-262 two physicians are required to examine a respondent received at a 24-hour facility under the provisions of that section; if a physician finds that a respondent is mentally ill, the physician must also find that the respondent is dangerous to himself or dangerous to others. North Carolina General Statutes § 122C-266 (1993). Appellant argues that because Dr. Kim, as a second physician, failed to check one of the boxes on the examination report that appellant was "dangerous to self" or "dangerous to others," Dr. Kim failed to state in the examina-

tion report that appellant was a danger to himself or a danger to others. We disagree.

The space on the bottom of the first page of the examination report asks for a clear description of findings. In this space, Dr. Kim wrote "[m]arkedly explosive personality. Very serious suicidal idea [sic] persist. He took O.D. prior to his admission here. He bolted out of the office when he was told of his need for hospitalization. He has been quite depressed. At this time he has no insight." Dr. Kim's findings describe a person who is dangerous to himself. Further, Dr. Kim explained at the hearing that he made a mistake by not checking the box in front of "dangerous to self" on the examination report. Dr. Kim's findings on the examination report and testimony at the involuntary commitment hearing are sufficient proof that appellant fit the category of one who was "dangerous to self."

[3] Appellant next argues that the trial court erred in not making a conclusion of law that appellant was either mentally ill or mentally retarded with an accompanying behavior disorder, as required by North Carolina General Statutes § 122C-268 (1993) so as to support the involuntary commitment of appellant. Appellant points out that the trial judge did not check the box "mentally ill" or "mentally retarded" supporting his conclusions of law. Further, appellant argues that the trial court's order did not contain sufficient findings of fact to support a conclusion of law that appellant was mentally ill or mentally retarded with an accompanying behavior disorder and dangerous to himself and others.

We have reviewed the testimony of Mrs. Woodie and Dr. Kim. Using the appropriate standard of review, we find there was competent evidence to support the factual findings made by the trial judge. See In re Jackson, 60 N.C. App. 581, 299 S.E.2d 677 (1983). We also note that the trial judge concluded that appellant was dangerous to himself and to others and found that the criteria was met for continuing court ordered treatment as an inpatient. While the better practice would have been for Dr. Kim to check the appropriate box on the examination report, his failure to do so, under the circumstances, does not constitute reversible error. For this Court to hold otherwise would elevate form over substance. We reject appellant's arguments as to these assignments of error.

Appellant last argues that the trial court's order of 14 June 1993 involuntarily committing appellant to a treating facility was in error and not supported by the evidence presented. We find the testimony

and evidence presented herein clearly supported the involuntary commitment of appellant. *In re Medlin*, 59 N.C. App. 33, 295 S.E.2d 604 (1982).

No error.

Judges GREENE and LEWIS concur.