William K. WHITE, Plaintiff,

v.

TOWN OF CHAPEL HILL, a municipal corporation; Ralph V. Pendergraph, individually and in his official capacity as Chief of Police of the Town of Chapel Hill; Greg Jarvis, individually and in his official capacity as Captain with Town of Chapel Hill Police Department; John Doe, I, individually and in his official capacity as law enforcement officer under the command of defendants Pendergraph and Jarvis; John Doe, II, individually and in his official capacity as law enforcement officer under the command of defendants Pendergraph and Jarvis; John Doe, III, individually and in his official capacity as law enforcement officer under the command of defendants Pendergraph and Jarvis; and John Doe, IV, individually and in his official capacity as law enforcement officer under the command of defendants Pendergraph and Jarvis, Defendants.

Civ. No. 1:93CV00304.

United States District Court,
M.D. North Carolina,
Durham Division.

Jan. 6, 1995.

**1430**

John F. Nieman, Jr., Kinnaird & Nieman, Chapel Hill, NC, for plaintiff.

Kari L. Kusswurm, Dan M. Hartzog, Cranfill, Sumner & Hartzog, Raleigh, NC, for defendants.

*MEMORANDUM OPINION*

BULLOCK, Chief Judge.

This case, brought under both 42 U.S.C. § 1983 and state law, requires the court to consider, in addition to the liability of a municipality for the alleged torts of its police officers, questions of the qualified immunity of the individual officers in the context of the Defendants' motions for summary judgment. After careful review, Defendants' motions will be granted on both the federal and state claims.

FACTS

A review of the record in this case, including numerous depositions, reveal the following facts. Slightly after 5:30 p.m. on May 19, 1992, members of the Chapel·Hill Police Department responded to a 911 call reporting a hostage situation in an apartment complex at an apartment occupied by Plaintiff William K. White and his then fiance, Rhonda Allen, two individuals with a history of substance abuse and mental illness. When the police arrived, Ms. Allen was outside the apartment. She related to James Hugerich, supervisor of the Crisis Unit and a trained police negotiator, that she had come home that day and found Plaintiff's journal notes expressing suicidal and homicidal thoughts. She had some of the notes with her. Hugerich read these notes which stated that Plaintiff wanted to drive down Interstate 85 and "blow away" certain persons and that Plaintiff could "blow his brains all over the wall," and which expressed Plaintiff's belief that Plaintiff was lethal to others. Hugerich was familiar with both Plaintiff and Ms. Allen, and had been to Plaintiff's apartment in 1991 as a result of an individual committing suicide in the apartment. At that time, Hugerich accompanied Plaintiff and Ms. Allen to the hospital emergency room so that they could be seen by a psychiatrist. As a result of that incident, Hugerich was aware that Plaintiff and Allen were allegedly alcoholics, and that she apparently suffered from a multiple personality disorder.

After showing Hugerich Plaintiff's journal entries, Allen explained to Hugerich that she was concerned that Plaintiff was dangerous, both to himself and others, and that after finding the journal she had confronted Plaintiff and called a psychiatrist at Duke Hospital and that Plaintiff had talked to the psychiatrist on the telephone. She said that Plaintiff had then become angry at her and began to choke and threaten her, and that she kicked him in the stomach and fled the apartment with the notes. She advised that he was carrying a .44 caliber revolver and handcuffs and had very little sleep or food for the last week and a half.

After reading the notes and conferring with Sabrina Garcia, a psychologist who also was a member of the Crisis Unit at the scene, Hugerich made telephone contact with the Plaintiff about 6:00 p.m. and asked him what had happened. Plaintiff advised Hugerich that Allen had been hospitalized two weeks previously and that her therapist advised him to make sure that he did not allow her to harm herself or Plaintiff, and since that time he had his .44 caliber revolver loaded and strapped to his side, in addition to his handcuffs. ·He confirmed that he had had very little sleep or food. He said that the day's episode began by Allen reading his notes, over-reacting and calling Duke Hospital, and threatening him with psychiatric hospitalization. A scuffle ensued, and Allen kicked him in the stomach where he had numerous staples from a surgery that removed a tumor and part of his pancreas and intestines. According to Plaintiff, Allen has a multiple personality disorder and, at the time of the scuffle, Allen had assumed one of her "alters," a 19–year–old, 6'3", 235–pound male, "Michael," whose physical strength Plaintiff could not match.

Plaintiff indicated he wanted the police to go away and leave him alone, and that, although he had no explanation for his journal notes, he was not suicidal or homicidal. Plaintiff insisted that he had a right to possess his gun and to remain in his apartment. Hugerich agreed and assured him that the police were not going to rush the apartment. Hugerich advised Plaintiff that the police were concerned for Plaintiff's own safety and for others in the crowded apartment complex. Hugerich had several telephone discussions with Plaintiff over a period of nearly six hours concerning securing the gun and getting help for Plaintiff. Plaintiff stated that he did not have to come out of his apartment in the absence of a warrant, and Hugerich assured the Plaintiff that the police did not have an arrest warrant for him, that he had done nothing wrong, and that they only wanted to help him. Finally, Plaintiff indicated that he had been working with Dr. Reisner of Duke Hospital towards a psychiatric commitment and gave Hugerich permission to talk to Dr. Reisner. Hugerich contacted Dr. Reisner, who arranged for the Plaintiff to be seen by a psychiatrist at the Duke emergency room. Hugerich advised Plaintiff of his arrangements with Dr. Reisner, and Plaintiff also talked with Dr. Reisner on the telephone.

Plaintiff testified that the pain in his side became more intense and that because of the pain he agreed to come out of his apartment and to go with Hugerich to the hospital for treatment of his injuries. Plaintiff and Hugerich agreed that Plaintiff would come out of the sliding glass door to the apartment with his finger through the open chamber of the pistol and with his hands up, that Hugerich would drive up in front of the apartment, open the trunk to his car, Plaintiff would put the pistol in the trunk, and that they would drive to the Duke Hospital emergency room.

Hugerich testified that at the agreed upon time, 11:15 p.m., he drove to the designated spot in front of the apartment and got out of his car. He said that Plaintiff was delayed in exiting the sliding door, that Plaintiff turned toward the door and remained facing the door for approximately sixty seconds, and that when Plaintiff turned around and faced the car, his hands were down at his sides and the gun was not visible. At that moment, other officers took Plaintiff to the ground and secured him with handcuffs. Plaintiff was taken to the Duke Hospital emergency room, where he was seen by Dr. Mary Soderstrom, who evaluated Plaintiff, made findings, and ordered that Plaintiff be involuntarily committed.

Plaintiff filed this action against the Town of Chapel Hill, and against Chief Ralph Pendergraph, Captain Greg Jarvis, both of whom were present at the scene, and law enforcement officers John Doe I–IV, individually and in their official capacities.[1] Plaintiff pleads one federal constitutional claim under 42 U.S.C. § 1983 with three bases—violations of the First, Second, and Fourth Amendments. Plaintiff also pleads four state-law claims—assault and battery, intentional infliction of emotional distress, false imprisonment, and defamation.

Defendants have moved for summary judgment, arguing that no unconstitutional or tortious conduct occurred, and that even if Plaintiff's constitutional rights were violated, the Town of Chapel Hill is not liable under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and the individual Defendants have qualified immunity.

### ANALYSIS

In examining a motion for summary judgment, the court must determine whether Defendants have shown "that there is no genuine issue of material fact and that [they are] entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering the evidence, all reasonable inferences are to be drawn in favor of the non-moving party.

---

1. The court assumes that the John Doe defendants are the officers at the scene who seized Plaintiff when he exited his apartment. Only the Town, Pendergraph, and Jarvis were served with process. Service upon these three defendants provides the John Doe defendants with sufficient constructive notice to give this court jurisdiction over the John Doe defendants. Therefore, all of the parties to this action are bound by the court's decision in this case. *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 317, 70 S.Ct. 652, 658–59, 94 L.Ed. 865 (1950).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). A non-movant may survive summary judgment by producing "evidence from which a jury might return a verdict in his favor." *Id.* at 257, 106 S.Ct. at 2514. Summary judgment doctrine is not "to be skewed from its ordinary operation" in qualified immunity cases. *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir.1992). However, "qualified immunity questions should be resolved at the earliest possible stage of a litigation." *Anderson v. Creighton*, 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987). Summary judgment is particularly appropriate in determining an official's entitlement to qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 817–18, 102 S.Ct. 2727, 2737–38, 73 L.Ed.2d 396 (1982); *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir.1991).

I. *Town of Chapel Hill's Liability*

 A suit against municipal officers in their official capacity is a suit against the municipality itself. *See Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir.1987), *cert. denied sub nom. City of Fayetteville v. Spell*, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988). A local government is liable for the constitutional violations of its employees under § 1983 when its employees violate the constitutional rights of the plaintiff under "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Furthermore, a municipality may be liable for constitutional violations of its officers acting pursuant to practices sufficiently known and approved to institute a custom. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–84 & n. 10, 106 S.Ct. 1292, 1299–1300 n. 10, 89 L.Ed.2d 452 (1986); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 820–24, 105 S.Ct. 2427, 2434–37, 85 L.Ed.2d 791 (1985). Finally, a municipality may be held liable under § 1983 for failure to train its officers adequately if such failure amounts to "deliberate indifference to the rights of persons with whom the police come into contact." *Canton*

*v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989).

Plaintiff's claims against the Town of Chapel Hill and its officers in their official capacities must fail. Plaintiff cites no policy statement, no well-settled custom, or indifference on the part of the Town of Chapel Hill as to the supervision and training of its employees. Citing *Pembaur*, 475 U.S. 469, 106 S.Ct. 1292, and *Spell*, 824 F.2d 1380, Plaintiff bases his claims against the Town of Chapel Hill on Chief Pendergraph's presence and decision-making at the scene. However, as *Pembaur* states, "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur*, 475 U.S. at 481–82, 106 S.Ct. at 1299. "Policy" does not include "episodic exercises of discretion in the operational details of government." *Spell*, 824 F.2d at 1386 (citing *Tuttle*, 471 U.S. at 823, 105 S.Ct. at 2436; *Pembaur*, 475 U.S. at 481 & n. 9, 106 S.Ct. at 1299 n. 9); *see also Zwarton v. City of Chicago*, 625 F.Supp. 1211, 1211 (N.D.Ill.1985) ("Plaintiffs have alleged only a single specific incident, namely their own, and that is not enough to establish a custom or policy."). The Chief of Police and other decision-makers on the scene were exercising their discretion in the carrying-out of a particular function—preventing Plaintiff from hurting himself or others, and taking Plaintiff for medical evaluation. The exercise of discretion by the Town of Chapel Hill's employees during this function did not give rise to a policy which would allow the Town of Chapel Hill to be liable for any constitutional violations that Plaintiff alleged occurred.

II. *Individual Defendants' Liability Under § 1983 for Alleged Constitutional Violations*

Plaintiff asserts that the individual Defendants violated his constitutional rights under color of state law and are therefore individually liable to him for civil damages under 42 U.S.C. § 1983. However, as explained below, Plaintiff's claims against the individual Defendants must fail.

Government officials performing discretionary functions are not liable under § 1983 for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. The qualified "immunity shield is necessarily more protective than is the defense on the merits." *Torchinsky*, 942 F.2d at 261 (citation omitted). Examining a claim of qualified immunity requires "(1) identification of the specific right allegedly violated; (2) determining whether at the time of the alleged violation the right was clearly established; and (3) if so, then determining whether a reasonable person in the officer's position would have known that doing what he did would violate that right." *Pritchett*, 973 F.2d at 312 (citing *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738). The first two determinations are pure questions of law, *id.* (citing *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738), while the third determination "may ... require factual determinations," *id.* (citing *Anderson*, 483 U.S. at 646 n. 6, 107 S.Ct. at 3042 n. 6).

As the first step in examining a qualified immunity defense, as directed in *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 1792–93, 114 L.Ed.2d 277 (1991), the court must determine whether Defendants' conduct violated Plaintiff's constitutional rights. Plaintiff alleges that his First Amendment right to free association, his Second Amendment right to bear arms, and his Fourth Amendment right not to be unlawfully seized were violated by Defendants. Each of these alleged constitutional violations are examined separately.

### A. *Plaintiff's First Amendment Claim*

Plaintiff alleges that Defendants violated his First Amendment right to associate freely when Defendants refused to allow Plaintiff's brother to enter Plaintiff's apartment during the stand-off. The First Amendment right to freedom of association is protectable in § 1983 actions. *See, e.g., Morrash v. Strobel*, 842 F.2d 64, 69 (4th Cir. 1987); *Thorne v. El Segundo*, 726 F.2d 459, 471 (9th Cir.1983), *cert. denied*, 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984); *Wilson*

*v. Taylor*, 658 F.2d 1021, 1027 (5th Cir. Unit B Oct. 1981); *Owens v. Rush*, 654 F.2d 1370, 1379–80 (10th Cir.1981). The right of freedom of association protects two general types of activity. *Roberts v. United States Jaycees*, 468 U.S. 609, 617 (1984); *see also Fleisher v. City of Signal Hill*, 829 F.2d 1491, 1499–1500 (9th Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988). The first general type is the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts*, 468 U.S. at 618, 104 S.Ct. at 3249. The second general type secures "choices to enter into and maintain certain intimate human relationships ... against undue intrusion by the State." *Id.* at 617–18, 104 S.Ct. at 3249. Even if the relationship of Plaintiff and his brother is in the category protectable by this second general type of protection, Defendants' decision to prohibit Plaintiff's brother from entering Plaintiff's apartment during a stand-off with Plaintiff—considered armed and dangerous by Defendants—is certainly not an undue intrusion by the State violative of the First Amendment.

### B. *Plaintiff's Second Amendment Claim*

Plaintiff alleges that Defendants violated his Second Amendment right to bear arms when Defendants surrounded Plaintiff's apartment and asked that Plaintiff exit with his gun disabled. The Second Amendment has been held unenforceable against state action. *Presser v. Illinois*, 116 U.S. 252, 265, 6 S.Ct. 580, 584, 29 L.Ed. 615 (1886) (Second Amendment "has no other effect than to restrict the powers of the national government."); *see also Justice v. Elrod*, 832 F.2d 1048, 1051 (7th Cir.1987); *Quilici v. Village of Morton Grove*, 695 F.2d 261, 269–70 (7th Cir.1982), *cert. denied*, 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170 (1983). Plaintiff cites no authority and presents no arguments to the contrary. As Defendants are state actors, Plaintiff cannot maintain a § 1983 claim based on a Second Amendment right to bear arms against Defendants.

C. *Plaintiff's Fourth Amendment Claim*

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." Plaintiff alleges that his Fourth Amendment rights were violated in two ways: (1) The surrounding of his apartment by the police and seizure of Plaintiff without a warrant; and (2) the use of excessive force in his seizure.

### 1. *Seizure of Plaintiff*

A threshold issue is the point at which Plaintiff was "seized." A person is seized if the person is detained by either physical force or the person submits to an assertion of authority. *California v. Hodari D.*, 499 U.S. 621, 626–29, 111 S.Ct. 1547, 1550–52, 113 L.Ed.2d 690 (1991). According to Plaintiff, he knew that he did not have to leave his apartment. Plaintiff remained in his apartment, speaking with various persons from time to time, for over five hours. During the time Plaintiff remained in his home, he was not seized because he had not submitted to any assertion of authority.

Plaintiff's decision to exit his apartment was voluntary and consensual. *See* Wayne R. LaFave, *Search and Seizure* § 5.1(a), at 389–92 (1987 & Supp.1995), and cases cited therein. Plaintiff testified that he left his home only because he was in pain from injuries sustained in his scuffle with Ms. Allen and because he had agreed to go with Hugerich to the hospital emergency room, and not because of any police coercion.

Thus, as evidenced by Plaintiff's testimony, the only nonconsensual and involuntary seizure was when Plaintiff was seized and taken down by the police following Plaintiff's exit. Plaintiff's seizure at that point, however, was supported by probable cause and did not require a warrant. The exigent circumstances created by Plaintiff's presence in a populated apartment complex parking lot with neither his hands nor his gun visible gave the police probable cause to seize him without a warrant.

Furthermore, Defendants argue that no warrant was needed to surround Plaintiff's house or to seize Plaintiff because N.C.Gen. Stat. § 122C–262 does not require a warrant. Section 122C–262 provides, in pertinent part, that

> [a]nyone, including a law enforcement officer, who has knowledge of an individual who is subject to inpatient commitment according to the criteria of G.S. 122C–261(a) and who requires immediate hospitalization to prevent harm to himself or others, may transport the individual directly to an area facility or other place, including a State facility for the mentally ill, for examination by a physician or eligible psychologist.

N.C.Gen.Stat. § 122C–262.

"[T]he general right to be free from seizure unless probable cause exists [is] clearly established in the mental health seizure context." *Gooden v. Howard County*, 954 F.2d 960, 968 (4th Cir.1992) (*en banc*) (citations omitted); *see also Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir.1991) (citations omitted) (seizure of a mentally ill person is analogous to criminal arrest and must be supported by probable cause). While section 122C–262 provides permission and procedures to transport those subject to inpatient commitment who require immediate hospitalization to prevent harm, section 122C–262 does not and cannot lessen the protection provided the mentally ill, or suspected mentally ill, by the Fourth Amendment.

To meet the Fourth Amendment's requirements in relation to section 122C–262, Defendants must have had probable cause to believe that Plaintiff was dangerous to himself and others. Defendants based their probable cause on, *inter alia:* the police had been called to Plaintiff's apartment in relation to a "hostage situation"; Plaintiff's journal notes referenced killing himself and others, *see In re Woodie*, 116 N.C.App. 425, 429, 448 S.E.2d 142, 144 (1994) (court found that person's stating that "he was going to kill himself" was evidence that immediate hospitalization was required to prevent harm to the person); Plaintiff admittedly had a gun on his person, *see In re Hernandez*, 46 N.C.App. 265, 271, 264 S.E.2d 780, 783 (1980) (possessing and seeking to possess weapons is sufficient evidence that the defendant was dangerous to others); and Plaintiff refused to come out of

his house. In addition, Hugerich, as a result of prior encounters with Plaintiff, was aware that Plaintiff experienced some psychological problems. When taking all of the circumstances into account, the court finds that, as a matter of law, Defendants had probable cause under N.C.Gen.Stat. § 122C–262. to surround Plaintiff's home, ask him to come out, and seize him upon his voluntary exit.

## 2. *Excessive Force*

█ Excessive force claims against law enforcement officials are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 1867–68, 104 L.Ed.2d 443 (1989). Determination of reasonableness "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. at 1871 (quoting *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642–43, 77 L.Ed.2d 110 [1983]) (internal quotations omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 [1968]).

"In determining what amount of force is objectively reasonable under the circumstances, due regard must be given to the fact that police officers are often forced to make split-second judgments, under tense, dangerous, and rapidly moving circumstances, about the amount of force necessary to effect a particular arrest." *Martin v. Gentile*, 849 F.2d 863, 869 (4th Cir.1988) (citations omitted).

Defendants cite *Hewitt v. City of Truth or Consequences*, 758 F.2d 1375, 1379 (10th Cir.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985), for the proposition that Plaintiff must show that the police used force that "shocks the conscience" in order to proceed with a § 1983 claim. However, *Hewitt* examined the defendants' conduct under "substantive due process," before the Supreme Court in *Graham v. Connor* clarified that excessive force claims are to be examined under the Fourth Amendment. *Graham*, 490 U.S. at 388, 109 S.Ct. at 1867–68.

The Fourth Circuit has indicated that the Supreme Court abandoned the "shocks the conscience" test in cases involving excessive force in *Graham*. *See, e.g., Shaw v. Stroud*, 13 F.3d 791, 802 (4th Cir.) ("During the time in which the complained of acts and omissions ... took place, [*i.e.*, before *Graham* was decided, the Fourth Circuit] applied a 'shock the conscience' test in evaluating claims of excessive force"), *cert. denied*, —— U.S. ——, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994); *see also Braley v. City of Pontiac*, 906 F.2d 220, 226 (6th Cir.1990). Therefore, to proceed on this excessive force claim, Plaintiff must allege that the police used objectively unreasonable force under the circumstances. Plaintiff only offers his own testimony that he was "tackled" on the pavement and was "dragged" to the car when Defendants seized him. Without more, the force alleged by Plaintiff is not objectively unreasonable under the circumstances. The degree of force alleged does not exceed that allowed law enforcement officials to protect themselves and others from armed persons, such as Plaintiff, who present a potential threat for causing grave harm. Under the circumstances, the force used by the officers' was objectively reasonable as a matter of law.

## 3. *Qualified Immunity*

█ Because the court has found that the officers did not violate Plaintiff's constitutional rights in seizing him, further examination of the qualified immunity defense is not necessary. Nevertheless, the court will still examine the second step in applying the Defendants' qualified immunity defense to Plaintiff's seizure and the manner in which it was accomplished. Such examination will require the court to determine whether, at the time of the alleged violation, the right was clearly established. The Supreme Court in *Anderson* stated:

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that

an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.

The Fourth Circuit has held that the litigant who brings suit against public officials bears the burden of clearly establishing the law allegedly violated. *Mitchell v. Rice,* 954 F.2d 187, 190 (4th Cir.) (citing *Clark v. Link,* 855 F.2d 156, 160–61 [4th Cir.1988] ), *cert. denied,* —— U.S. ——, 113 S.Ct. 299, 121 L.Ed.2d 222 (1992). "The law must be established with some particularity." *Id.* (citing *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039). Plaintiff cites no cases and makes no arguments that demonstrate that his seizure violated clearly established law. The court notes that *Mitchell* and *Clark* must be read in light of *Elder v. Holloway,* —— U.S. ——, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994), in which the Supreme Court stated that "[a] court engaging in review of a qualified immunity judgment should ... use its 'full knowledge of its own [and other relevant] precedents.'" *Id.* at ——, 114 S.Ct. at 1023 (examining appellate courts' review of qualified immunity) (quoting *Davis v. Scherer,* 468 U.S. 183, 192 n. 9, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 [1984] ).

The court's research reveals no Supreme Court or Fourth Circuit cases which "clearly establish" any constitutional right that may have been violated. *See Jensen v. Conrad,* 747 F.2d 185, 194–95 (4th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985). As the court in *Williamson v. City of Virginia Beach,* 786 F.Supp. 1238 (E.D.Va.1992), *aff'd,* 991 F.2d 793 (4th Cir.1993) (table), recognized, "there are currently conflicting views as to whether 'non-controlling precedents' (*i.e.* precedents from other jurisdictions) can 'clearly establish' a right for qualified immunity purposes."

*Id.* at 1262. Even so, no non-controlling cases examined by the court, including *United States v. Al–Azzawy,* 784 F.2d 890, 893–95 (9th Cir.1985), *cert. denied,* 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986), *United States v. Maez,* 872 F.2d 1444, 1449–53 (10th Cir.1989), *United States v. Morgan,* 743 F.2d 1158, 1161–68 (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985), and similar cases,[2] make the contours of any constitutional rights allegedly violated sufficiently clear in the situation at bar. Under *Anderson,* the law is not so "clearly established" that Defendants do not have qualified immunity for any constitutional violation that Plaintiff alleges occurred when police surrounded his house and asked him to come out. Furthermore, the officers' belief that N.C.Gen.Stat. § 122C–262 allowed them to proceed as they did was an objectively reasonable belief.

Although *Graham v. Connor* left open the question of whether qualified immunity would apply in an excessive force case, the Fourth Circuit has said that "[t]here is no principled reason not to allow a defense of qualified immunity in an excessive use of force claim, when it is allowed in other actions alleging violations of the fourth amendment." *Slattery v. Rizzo,* 939 F.2d 213, 215 (4th Cir.1991). Therefore, assuming *arguendo* that excessive force was used, the court will consider whether qualified immunity would protect the officers.

The present case can be distinguished from *Rainey v. Conerly,* 973 F.2d 321, 324 (4th Cir.1992). In *Rainey,* if the plaintiff's "version of the facts [had been] credited, then [the defendant officers'] actions could not, by any reasonable officer, be considered to be within the bounds of the law." *Id.* at 324. In the present case, Plaintiff has offered only generalized allegations of the defendant officers' "tackling" and "dragging" Plaintiff. Therefore, resolution of what actually happened is not necessary for a qualified

---

**2.** In *Al–Azzawy, Maez, Morgan,* and similar cases, courts have indicated that the surrounding of a person's home by law enforcement officials with a coercive show of force and a subsequent order to exit the home, accompanied by an involuntary exit by the person, requires a search warrant or exigent circumstances to be lawful.

The case at bar is substantially different from the above-cited cases. Plaintiff was not ordered from his home, nor did Plaintiff exit involuntarily.

immunity analysis, because in evaluating qualified immunity the focus is on the perception of the officers. *Id.* ("In the absence of a genuine dispute as to the reasonableness of the officers' *perceptions,* the issue of qualified immunity is ripe for summary judgment.") (quoting *Gooden,* 954 F.2d at 964–65); *see also Rowland v. Perry,* 41 F.3d 167, 174 (4th Cir.1994) (officer "had an objectively reasonable belief in the existence of probable cause"). There is no genuine dispute as to the reasonableness of the officers' perceptions in the present case. Hugerich testified that, contrary to their agreement, Plaintiff's gun was not in view. The officers were aware that Plaintiff had, at least earlier in the evening, possessed a loaded hand-gun.

In sum, the court holds that none of Plaintiff's constitutional rights were violated. Even if some constitutional violation had occurred, the individual Defendants have qualified immunity from liability under the facts taken in the light most favorable to Plaintiff.

### III. *State–Law Claims*

■ Plaintiff alleges four state-law tort claims against Defendants [3]: (1) Assault and Battery; (2) False Imprisonment; (3) Intentional Infliction of Emotional Distress; and (4) Defamation. The court will address Plaintiff's state-law tort claims because Plaintiff's state and federal claims "derive from a common nucleus of operative fact" and are inextricably intertwined. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Each of Plaintiff's state-law tort claims are discussed separately below.

### A. *Assault and Battery*

■ Plaintiff alleges that Defendants committed the tort of assault and battery when Defendants seized Plaintiff. Under North Carolina law, "an assault by a law enforcement officer upon a citizen can pro-

vide the basis for a civil action for damages against the officer only if a plaintiff can show that the officer used force against plaintiff which was excessive under the given circumstances." *Fowler v. Valencourt,* 108 N.C.App. 106, 114, 423 S.E.2d 785, 790 (1992) (citations omitted), *rev'd in part,* 334 N.C. 345, 435 S.E.2d 530 (1993). "[A] law enforcement officer has the right, in making an arrest and securing control of an offender, to use only such force as may be reasonably necessary to overcome any resistance and properly discharge his duties." *Myrick v. Cooley,* 91 N.C.App. 209, 215, 371 S.E.2d 492, 496 (citations omitted), *disc. rev. denied,* 323 N.C. 477, 373 S.E.2d 865 (1988). For the reasons discussed *supra* part II.C., Plaintiff's state-law assault and battery claim must fail. As a matter of law, Plaintiff does not present any evidence that Defendants used unreasonable force under the circumstances.

### B. *False Imprisonment*

■ In order to sustain a claim for false imprisonment, Plaintiff must show that he was detained or restrained against his will, and that his detention or restraint was unlawful. *Hoffman v. Clinic Hosp. Inc.,* 213 N.C. 669, 670, 197 S.E. 161, 162 (1938). Unlawfulness is an essential element. *Black v. Clark's Greensboro, Inc.,* 263 N.C. 226, 228, 139 S.E.2d 199, 201 (1964). As discussed *supra* part II.C., Plaintiff's seizure was constitutionally lawful. The court notes that it is possible, under North Carolina law, "for an arrest to be constitutionally valid and yet illegal under state law." *Myrick,* 91 N.C.App. at 212, 371 S.E.2d at 494 (citation omitted). However, Plaintiff was legally subject to seizure without a warrant pursuant to N.C.Gen.Stat. § 122C–262 because, as discussed *supra* part II.C.1., Defendants had probable cause to believe that Plaintiff was "subject to inpatient commitment ... and ... require[d] immediate hospitalization to

---

**3.** Under North Carolina common law, a municipality is not liable for the torts of its employees committed while performing a governmental function. *See Edwards v. Akion,* 52 N.C.App. 688, 691, 279 S.E.2d 894, 896, *aff'd,* 304 N.C. 585, 284 S.E.2d 518 (1981). However, a municipality's immunity from civil liability in tort is waived to the extent of the amount of liability

insurance. N.C.Gen.Stat. § 160A–485(a); *see Edwards,* 52 N.C.App. at 691, 279 S.E.2d at 896 (citing *White v. Mote,* 270 N.C. 544, 155 S.E.2d 75 [1967]). Although it is unclear from Plaintiff's complaint, the court will assume that Plaintiff seeks to include the Town of Chapel Hill as a defendant in each of Plaintiff's state-law claims.

prevent harm to himself or others." N.C.Gen.Stat. § 122C–262. Therefore, Plaintiff cannot sustain his claim for false imprisonment against the Defendants.

### C. Intentional Infliction of Emotional Distress

■ To succeed on his claim for intentional infliction of emotional distress, Plaintiff must show that Defendants engaged in extreme and outrageous conduct which was intended to and did in fact cause Plaintiff severe and disabling emotional distress. *Stanback v. Stanback,* 297 N.C. 181, 196–97, 254 S.E.2d 611, 621–22 (1979), *overruled in part by Dickens v. Puryear,* 302 N.C. 437, 276 S.E.2d 325 (1981); *Lenins v. K–Mart Corp.,* 98 N.C.App. 590, 598, 391 S.E.2d 843, 848 (1990). Whether or not Defendants' alleged conduct may reasonably be regarded as extreme and outrageous is a question of law for the court. *Harris v. NCNB Nat'l Bank,* 85 N.C.App. 669, 676, 355 S.E.2d 838, 844 (1987) (citation omitted). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Restatement (Second) of Torts* § 46 comment d. On the night of May 19, 1992, Defendants acted as reasonable police officers in attempting to prevent Plaintiff from harming himself and others. Defendants' intent was to keep Plaintiff from hurting himself or others. Plaintiff has offered absolutely no evidence that would allow a reasonable jury to find Defendants' conduct extreme and outrageous. For these reasons, the court finds that, as a matter of law, Plaintiff cannot sustain a claim for intentional infliction of emotional distress against Defendants.

### D. Defamation

■ Plaintiff alleges that Defendants referred to Plaintiff as a "gunman" when speaking with the press. Plaintiff claims that this allegation, and other, non-specified allegations, brought Plaintiff into disrepute in the community and, therefore, is actionable as slander. As an example of the alleged effect of Defendants' alleged statements to the press, Plaintiff claims that he was requested to leave his apartment complex; however, that request was later rescinded. Plaintiff alleges no other particular damages resulting from Defendants' allegedly defamatory statements.

In order for Plaintiff to establish a claim for slander *per se* against a Defendant, Plaintiff must demonstrate that (1) Defendant spoke base or defamatory words which tended to prejudice Plaintiff in his reputation, office, trade, business or means of livelihood or hold him up to disgrace, ridicule or contempt; (2) the statement was false; and (3) the statement was published or communicated to and understood by a third person. *West v. King's Dep't Store, Inc.,* 321 N.C. 698, 703, 365 S.E.2d 621, 624 (1988) (citations omitted).

Truth is a complete defense to a claim of slander. *Parker v. Edwards,* 222 N.C. 75, 78, 21 S.E.2d 876, 878 (1942). Plaintiff argues that the use of the word "gunman" to describe him was false as he did not "wield" or "brandish" a gun. Webster's Dictionary defines "gunman" as, *inter alia,* "[a] man armed with a gun." *Webster's II New Riverside University Dictionary* (1988). Allegedly slanderous statements are to be considered in context. *See Tyson v. L'eggs Products, Inc.,* 84 N.C.App. 1, 13–14, 351 S.E.2d 834, 842 (1987). In the present case, the "gunman" statement and other unspecified statements are alleged to have been made during and after a long stand-off with Plaintiff who admittedly had a gun in his possession. If the statements that were made were a fair representation of the full truth, Plaintiff's claim for slander is barred. *See Parker,* 222 N.C. at 78, 21 S.E.2d at 878–79. Given the understood meaning of the word "gunman," and the circumstances under which the statements were alleged to have been made, the court finds that no reasonable jury could find that the alleged statements were false.[4]

---

4. In seeking to demonstrate element two, Plaintiff makes a unique analogy in arguing that the mere possession of a gun does not make one a "gunman." Plaintiff asks: Would the possession of a newspaper make one a "newspaperman"? This answer to this question—in most circum-

In addition, Plaintiff presents no evidence that a third person heard and understood any of the allegedly defamatory statements. "[A] mere possibility that someone might have heard the alleged [defamatory statements] is not enough" to proceed with a claim of slander. *West*, 321 N.C. at 704, 365 S.E.2d at 625 (citing *Tyer v. Leggett*, 246 N.C. 638, 641, 99 S.E.2d 779, 782 [1957]). For these reasons, taking the evidence in the light most favorable to Plaintiff, Plaintiff cannot proceed with his defamation claim against Defendants.

In sum, in examining Plaintiff's state-law tort claims, the court finds that no genuine issues of material fact exist and, taking the evidence in the light most favorable to Plaintiff, Defendants are entitled to judgment as a matter of law.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### ORDER AND JUDGMENT

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendants' motions for summary judgment as to all of Plaintiff's claims are **GRANTED** and this action is **DISMISSED** with prejudice.

stances—is certainly "No." Similarly, possession of the daily mail does not make one a "mailman"; holding a container of milk does not make one a "milkman"; and sitting in a chair does not necessarily make one the "chairman." However, in certain circumstances, these labels *would* apply and *would* be *true*. As discussed in the text accompanying this footnote, allegedly slanderous remarks must be viewed in context; the Defendants' reference to Plaintiff as a "gunman," if made, was a fair representation and truthful remark under the circumstances.